# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39486**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Johnathan G. RANKIN**
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 9 December 2019

———————————

*Military Judge:* Jefferson B. Brown (arraignment); Michael D. Schag.

*Approved sentence:* Dishonorable discharge and reduction to E-1. Sentence adjudged 1 March 2018 by GCM convened at Scott Air Force Base, Illinois.

*For Appellant:* Major Jarett F. Merk, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, MINK, and D. JOHNSON, *Appellate Military Judges.*

Chief Judge MAYBERRY delivered the opinion of the court, in which Senior Judge MINK and Judge D. JOHNSON joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

MAYBERRY, Chief Judge:

A general court-martial composed of a military judge sitting alone found Appellant guilty, contrary to his plea, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §

920.[1] The military judge sentenced Appellant to a dishonorable discharge, reduction to the grade of E-1, and a reprimand. The convening authority approved the adjudged sentence except for the reprimand.

On appeal, Appellant raises one assignment of error: the military judge erred in excluding evidence under Mil. R. Evid. 412. We find no prejudicial error and affirm.[2,3]

## I. BACKGROUND

Appellant was a first term Airman at Scott Air Force Base (AFB), Illinois. In July of 2017, he befriended another first term Airman, Airman First Class (A1C) RB. Appellant's interactions with A1C RB started when she briefly dated a friend of his, Airman (Amn) RM. When that relationship ended, A1C RB continued her friendship with Appellant. On 22 July 2017, Appellant, A1C RB, and a group of other Airmen from Scott AFB went on an overnight hiking trip sponsored by the base chapel. Over the course of the weekend Appellant and A1C RB "hung out" and went on hikes together with other members of the group. Multiple pictures of the two of them were taken over the course of the weekend and entered into evidence. After returning to Scott AFB in different cars, A1C DL, who also went on the hiking trip, invited A1C RB to his dorm room to watch a movie with him and his roommate. A1C RB took it upon herself to invite Appellant to watch the movie as well. A1C RB and Appellant both laid on A1C DL's bed and watched the movie. Appellant had his arm under A1C RB and their feet were intertwined.

According to A1C RB's testimony, after she and Appellant left A1C DL's room, they went to her dorm room. After talking until about 0100 hours, with both of them sharing events from their past and A1C RB becoming emotional and crying, A1C RB wanted to go to sleep. Appellant was concerned about her well-being and did not want to leave her alone. He offered to sleep on her floor, but A1C RB told him he could sleep in her bed with her. A1C RB changed out

---

[1] All references in this opinion to the Uniform Code of Military Justice and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] All pretrial motions regarding Appellant's request to introduce evidence under Mil. R. Evid. 412 were sealed as were the transcripts of the multiple hearings involving the motions. The opinion contains discussion of sealed material necessary for our analysis.

[3] The Defense sought to admit 13 items of evidence that were potentially excludable under Mil R. Evid. 412. The military judge heard evidence and argument and ultimately admitted all but two items, which constitute the assignment of error filed in this case.

of her sweatpants into "cute pajama shorts" that matched her "cute underwear" and then laid in the bed with her back to Appellant.

The details A1C RB provided regarding what happened after she and Appellant went to sleep in her bed changed over the course of time, but the underlying fact pattern did not change. At some point during the night, A1C RB awoke and felt Appellant's arm around her; she had no problem with this and went back to sleep. Sometime later, A1C RB was cognizant of Appellant's hand on her stomach, under her shirt, touching or caressing her stomach. Over time, Appellant moved his hand down under her shorts and underwear, continuing to touch and caress her. A1C RB indicated she was not fully awake until she felt his finger in her vagina. At this point A1C RB said "are you f[***]ing kidding me," and Appellant removed his hand and sat up startled. A1C RB told him to "go back to sleep . . . . We'll deal with this in the morning."

Over the next few days, Appellant and A1C RB spent time together in Appellant's dorm room and went to a movie. A1C RB and Appellant also continued to text one another, and some of A1C RB's texts referred to taking a shower or being naked. Additionally, on one occasion while A1C RB was in Appellant's dorm room, they talked on a video call with Appellant's mother, while A1C RB sat on the bed leaning over Appellant so she could see, and be seen on, the screen. According to Appellant's mother, she jokingly asked if A1C RB was Appellant's "girlfriend" who might someday give her "grandbabies," and A1C RB responded with laughter. A1C RB and Appellant also "hung out" with other Airmen who played a game called "two truths and a lie." During the playing of "two truths and a lie," one of the Airmen stated "I was sexually assaulted" as one of his three statements. The other members were supposed to discern which were true and which was a lie. A1C RB perceived Appellant as making light of sexual assault during this phase of the game and that angered her. That evening, she told another Airman that Appellant had "put his hand in her pants" and told her sister she had been "touched inappropriately." The following day, A1C RB reported being sexually assaulted to a supervisor, a Sexual Assault Response Coordinator (SARC), and the Air Force Office of Special Investigations (AFOSI).

During her interview with AFOSI, A1C RB called Appellant after AFOSI's suggestion, and the phone call was recorded. The conversation included:

> WIT [A1C RB]: . . . I need to talk, [Appellant]. I can't talk to you in person because I am not like, going to say what I want to say and I'm at the park right now. I had a really rough day today. So, do you have time to talk right now?
>
> ACC [Appellant]: Yeah, yeah, yeah. I got time.

WIT: I don't know, I'm just having such a rough time about the other night, on Sunday.

ACC: You talking about me and you?

WIT: Yeah.

ACC: What about it -- what about it are you having a rough time about?

WIT: I don't know. I'm just very upset. I think the thing that's bothering me the most is that I recall what happened but, you know, I was sleeping so I don't really know what happened.

ACC: All right, you woke up exactly right then so . . .

WIT: You kept saying that it was a mistake, that you made a mistake.

ACC: That was it.

WIT: What was the mistake, [Appellant]? It's bothering me that I don't know. Like, I remember waking up to it, but what happened?

ACC: You don't remember -- we talked about this in person.

WIT: [Appellant], I can't talk to you about this in person. Every time we start talking about it you know I push it off because I see the look on your face.

ACC: Okay, you won't have to say anything, I'll just tell you exactly what happened the whole night.

WIT: Can you just tell me right now, [Appellant]?

ACC: Well, I'm out in public, I can't just say it out in public.

. . . .

ACC: All right, so we were both sleeping, right. I woke up, right?

WIT: I guess.

ACC: And then I . . .

WIT: Yeah?

ACC: All right, so I woke up. I can't do it over the phone.

WIT: [Appellant], if you can't even do it over the phone, what makes you think you're going to be able to look at me in the face and say it. I'm not going to be able to deal with it until you tell me.

ACC: Because I don't know your reaction.

WIT: Can you please just tell me?

ACC: It don't feel right over the phone. As far as I got was putting my hand in your pants and then you woke up right there and then. That's as far as it got.

WIT: [Appellant], I really remember feeling you more than that.

ACC: Touching you more than that? Like what?

WIT: You tell me.

ACC: I don't know what you're talking about. You mean to tell me that -- hold up. What was I doing? What do you think I was doing?

WIT: [Appellant], I remember you actually putting your fingers in somewhere.

ACC: All right, that's what I was saying. That's as far as it got.

. . . .

WIT: I want you to tell me. I'm doing the talking but I feel like you're just agreeing with me. I just want to have a clear mind and I just want to hear from you. I want to hear it in your voice so I can move on. Can you please just do that so I can go home and get something to eat? I just need to hear it, [Appellant].

ACC: All right, I woke up laying on my back, your legs was over my right leg, my left hand went under the covers, went in your pants, I touched her [sic] vagina, you woke up, you said something, I pulled out, I pulled my hand away from under the covers, got up and sat at the end of the bed, moved away from you. That was it.

Later that night, Appellant sent a text to A1C RB:

Hey I understand if you don't like me or don't wanna talk to me any more, honestly I wouldn't blame you or be mad at you for that, I just don't want you to feel like your the reason or you led me on or it could have been avoided if you didn't let me say( basically thinking it's your fault) I also don't want you to carry it on, I'm not asking you to let it go or to move or even forgive me but I really don't want you thinking I'm one of those people who don't know what respect, care, friendship, etc is, cause that wouldn't be true, which is why I'm fine with whatever you wanna do, even if it's something I wouldn't want( like not being friends

5

any more) I will respect your decision, I don't expect you to reply
or care about this when you first see it but at least you see that
I actually care about your feelings ( at least I hope that's what I
could have shown ) Night

At trial, A1C RB's recollection of many specifics was minimal. For example,
she testified she did not remember who invited Appellant to watch the movie
in A1C DL's room and did not recall lying on the bed with Appellant when
watching the movie in A1C DL's room. She did not recall telling AFOSI that
she woke up to Appellant hugging her, that she went back to sleep because she
did not care that he was hugging her, and that Appellant was asleep when he
hugged her. Her testimony as to certain events contradicted the testimony of
other witnesses. A1C DR, one of the Airmen that was playing "two truths and
a lie" and a friend of A1C RB, testified that A1C RB told him "she woke up to
[Appellant] sticking his hand in her pants" and that he never suggested A1C
RB should report the incident. A1C RB's recollection was that after she told
A1C DR about what happened he asked if she considered reporting it and her
response was "why would I report that, nothing happened" or words to that
effect. However, she did specifically recall a conversation she and Appellant
had in the bed before they went to sleep. A1C RB testified she told Appellant
". . . I don't see you [as] more than a friend and I don't want to, like, I don't
want you sleeping here if you think that you are more than a friend and I don't
want to be surprised by anything;" his response was "you can trust me, I'm not
going to hurt you like everyone else did."

In response to a cross-examination question about whether Appellant took
off his shirt when he got into her bed, A1C RB stated "I saw that I said that in
the [AF]OSI video, but I don't remember. . . . I don't want to answer yes or no
because I don't remember." On multiple occasions during cross-examination,
trial defense counsel asked A1C RB if watching her recorded AFOSI interview
would refresh her recollection. Once she responded "I don't want to hear it,"
but ultimately acknowledged it would refresh her memory, and later replied
that watching the video would not refresh her recollection. Defense counsel
requested to play the video for the purpose of impeachment because the wit-
ness was refusing the have her memory refreshed and trial counsel objected
and indicated the defense have to live with her answer that it would not refresh
her recollection. The military judge acknowledged the conundrum of Defense
being unable to offer extrinsic evidence to impeach A1C RB when it was clear
she was avoiding the question, stating "she's probably avoiding the question.
She's answered that question in the past in the affirmative." In an effort to
resolve the issue, trial counsel asked A1C RB why she believed watching the
video would not jog her recollection, to which she responded, "I want to say
what I remember now." Eventually, she agreed to watch the video, which made

her other statements available to the fact finder. However, A1C RB never admitted to recalling what she said to AFOSI, she would simply agree that the video included statements made by her. In total, the video interview was used to refresh her recollection six times.

## II. DISCUSSION

**A. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). "A military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *Id.* (quoting *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015)); *see also United States v. Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011) ("Findings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo." (citation omitted)). The application of Mil. R. Evid. 412 to proffered evidence is a legal issue that appellate courts review de novo. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (citation omitted). Requiring the Defense to demonstrate proffered Mil. R. Evid. 412 evidence by a preponderance of the evidence is an abuse of discretion. *United States v. Leonhardt*, 76 M.J. 821, 826 (A.F. Ct. Crim. App. 2017).

Mil. R. Evid. 412 provides that evidence offered by the accused to show that the alleged victim engaged in other sexual behavior is generally inadmissible, with three limited exceptions. The burden is on the defense to overcome Mil. R. Evid. 412's general rule of exclusion by demonstrating an exception applies. *United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998) (citation omitted). The second exception provides that evidence of specific instances of sexual behavior by the alleged victim with respect to the accused is admissible if offered by the accused to prove consent. The third exception provides that the evidence is admissible if its exclusion "would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C). This exception includes an accused's Sixth Amendment right to confront witnesses against him, including the right to cross-examine and impeach those witnesses. *Ellerbrock*, 70 M.J. at 318 (citations omitted). Generally, evidence of other sexual behavior by an alleged victim is constitutionally required and "must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when [it] is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *Id.* (citation omitted).

Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Materiality "is a

multi-factored test looking at the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue." *Ellerbrock*, 70 M.J. at 318 (alteration in original) (citation and internal quotation marks omitted). The dangers of unfair prejudice to be considered "include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

## B. Analysis

Appellant contends the military judge abused his discretion by denying the Defense's motion to offer evidence under the exceptions to Mil. R. Evid. 412 of pre-offense "flirting" and that A1C RB had been previously sexually assaulted. Additionally, Appellant asserts the military judge applied the wrong standard of review in reaching his decision.

In his written ruling, the military judge asserted the Defense:

> bears the burden of persuasion by a preponderance of the evidence . . . . [Rule for Courts-Martial (R.C.M.)] 905(c)(1); 905(c)(2)(A). The defense bears the burden to prove that the evidence they seek to admit falls under an exception to [Mil. R. Evid.] 412. *See United States v. Banker*, 60 M.J. 216, 218, 223 (C.A.A.F. 2004).

### 1. Pre-Offense "Flirting" between Appellant and A1C RB

Appellant asserts that the military judge erred in not admitting evidence that A1C RB was "playful" and "huddled" with Appellant while they were on the overnight hiking trip. Trial defense counsel characterized this evidence as A1C RB "engaged in what a reasonable person would consider flirtatious behavior" with Appellant in the day preceding the alleged sexual assault. While challenging whether or not this behavior constituted sexual behavior and was thereby under the purview of Mil. R. Evid. 412, Appellant asserts the evidence was relevant in that it explained facts and circumstances leading to Appellant finding himself in A1C RB's bed that evening, and it was admissible under Mil. R. Evid. 412(b)(1)(B) and (C) to prove either consent or reasonable mistake of fact as to consent.

At trial, the Government did not object to the admission of this evidence, specifically asserting that if the Defense was able to satisfy its factual burden that this actually occurred, it would be admissible under Mil. R. Evid. 412(b)(1)(B). A1C RB's special victims' counsel (SVC) did object to the admission of the evidence on the basis that the evidence was not relevant to consent because of the length of time—over 24 hours—between the evidence of "flirt-

ing" and the alleged sexual assault. The SVC asserted that in light of the additional evidence from A1C RB that she later informed Appellant she was not interested in engaging in sexual activity, did not want to "lead on" Appellant, and did not want him to "make a move" on her, any perceived flirting was irrelevant to the issue of consent.

A1C RB testified at the motions hearing and denied flirting with Appellant. She stated that she "hung out" a few times with Appellant throughout the trip, they did some hikes together, everybody ate together, and she "hung out" with her friends, including Appellant, in the cabin room as well. A1C RB testified she was equally "playful" with everyone on the trip, she "did not treat [Appellant] differently than any of [her] friends," and the only time she and Appellant were close was for pictures. She concluded her testimony on this issue: "I never acted any differently than I did to any of my other friends. I treated him the same way I treated everybody and I don't consider that flirting." The Government stipulated to the expected testimony of another member who attended the hiking trip that he would describe A1C RB as flirtatious toward Appellant on the trip.[4]

The military judge ruled this evidence was not admissible, stating:

> The "playfulness" described here is much more remote and generalized as compared to the subject matter of ¶¶(a) and (b) of the Defense's Motion.[5] The remoteness renders the information irrelevant. To the extent there could be some marginal relevance exhibited by this evidence, here any probative value of the evidence is outweighed by the dangers of unfair prejudice. This evidence is not admissible under [Mil. R. Evid.] 412.

(Footnote inserted).

On appeal, Appellant asserts that the military judge erred in both finding the evidence was not relevant and that the unfair prejudice outweighed any possible probative value. Appellant asserts that the military judge abused his discretion by "weighing" the evidence and provided no analysis in reaching his conclusion that the danger of unfair prejudice outweighed any probative value. The Government asserts that the evidence of the interactions on the hiking

---

[4] The member, A1C RM, was deployed at the time of the hearing.

[5] Paragraph (a) of the Defense's motion proffered that A1C RB "cuddled" with Appellant on a bed with their "feet intertwined" on the night of the charged incident and paragraph (b) proffered A1C RB's decision to change into "cute underwear and cute pajama shorts" shortly before going to bed with Appellant on the night of the charged incident. This evidence was admitted by the military judge.

trip created "a weak logical connection to support a *reasonable* mistake in Appellant's mind that A1C RB would consent to vaginal penetration over 24 hours later." The Government repeatedly distinguishes the evidence of flirting as "not sexual or romantic in nature" and did not involve "intimate, physical contact between A1C RB and Appellant." The Government goes on to assert that even if the exclusion of this evidence was error, it was harmless beyond a reasonable doubt.

Initially we must determine whether or not the evidence that A1C RB "flirted" with Appellant during the hiking trip constitutes Mil. R. Evid. 412 evidence. Nothing about the interactions on the hiking trip directly established the existence of any sexual conduct between A1C RB and Appellant. The underlying interactions themselves were not excluded and trial defense counsel was able to cross-examine A1C RB about all of her interactions with Appellant during the hiking trip. What was excluded was the characterization of the interactions as "flirting." While we find the evidence to be at best only minimally under the Mil. R. Evid. 412 umbrella, we will assume *arguendo* that the conduct falls within the purview of Mil. R. Evid. 412.

This evidence involved Appellant and A1C RB, and was being offered to prove consent, or mistake of fact as to consent. Accordingly, it would fit under the Mil. R. Evid. 412(b)(1)(B) or (C) exceptions if it were relevant, material, and the probative value outweighed the danger of unfair prejudice. The military judge erroneously applied a preponderance of the evidence standard and found the evidence to be "much more remote and generalized" than the interactions between Appellant and A1C RB after they returned to Scott AFB on Sunday, and determined the "remoteness render[ed] the information irrelevant." This was the wrong standard to demonstrate proffered Mil. R. Evid. 412 evidence and as such constituted an abuse of discretion. *See Leonhardt*, 76 M.J. at 826 (requiring the Defense to demonstrate proffered Mil. R. Evid. 412 evidence by a preponderance of the evidence is an abuse of discretion). The military judge's limited analysis appears to focus more on the weight of the evidence than the relevance, and relevance "depends on the substance of the evidence, not its relative strength in relation to other evidence in the case." *Id.* at 827.

The underlying evidence of "flirting" in the 24–36 hour span prior to the charged offense, and continuous with all the other evidence of the interactions of Appellant and A1C RB during that 36 hour time span, which was not excluded, was relevant. The "flirting" did not have to independently prove consent or mistake of fact as to consent, it only had to have a tendency to make consent or mistake of fact as to consent more or less probable than without it. For the same reason, this evidence was material as consent was very much an

issue in the case. Finally, with regard to whether the probative value out-weighed the danger of unfair prejudice, there was no articulable prejudice in light of the fact that the underlying interactions were admitted. The military judge erred.

Having found error, we must now determine if it was harmless beyond a reasonable doubt—whether there is a "reasonable possibility" that the error "might have contributed to the conviction." *Ellerbrock*, 70 M.J. at 320 (quoting *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007)). In light of the fact that all the evidence addressing the interactions between Appellant and A1C RB during the hiking trip was admitted, in addition to all the other evidence admitted at trial involving the interactions between A1C RB and Appellant beginning on 22 July 2017, we find the error to be harmless beyond a reasonable doubt. Appellant had the opportunity to argue the totality of the circumstances supporting his theory of consent or mistake of fact as to consent. Trial defense counsel was able to thoroughly cross-examine A1C RB and point out the numerous inconsistencies with her recollection at trial compared to her prior statements and the testimony of the other witnesses. Appellant was not precluded from putting on his defense, and his counsel fully argued their defense theory to the military judge.

### 2. Prior Sexual Assault

Appellant asserts the military judge erred in not allowing the introduction of evidence that A1C RB had been sexually assaulted as a child. The Defense's basis for why this evidence was admissible was to establish a motive to fabricate on the part of A1C RB. Trial defense counsel asserted that this evidence did not fall under Mil. R. Evid. 412, but if it did, it was constitutionally required under Mil. R. Evid. 412(b)(1)(C). Trial defense counsel affirmatively asserted they did not intend to proffer that the prior sexual assault report was false. Trial counsel asserted this evidence did fall under Mil. R. Evid. 412 and no exceptions applied.[6]

---

[6] We note that in *United States v. Erikson,* 76 M.J. 231, 235 n.2 (C.A.A.F. 2017), the United States Court of Appeals for the Armed Forces (CAAF) questions in a footnote the application of Mil. R. Evid. 412 to a prior sexual assault of a victim because "[they] fail to see how the sexual assault of a victim relates to the victim's 'sexual behavior' or 'sexual predisposition.'" We do not assume this footnote overrules by implication CAAF precedents of *United States v. Velez*, 48 M.J. 220, 227–28 (C.A.A.F. 1998), and *United States v. Pagel*, 45 M.J. 64, 69–70 (C.A.A.F. 1996), and will follow the binding precedent of those cases. *See also United States v. Taylor*, ARMY 20160744, 2018 CCA LEXIS 499, at *16 (A. Ct. Crim. App. 16 Oct. 2018) (unpub. op.) (mem.) (following the precedent of *Pagel* and finding evidence of prior sexual abuse was evidence within the meaning of Mil. R. Evid. 412), *rev. denied*, 78 M.J. 432 (C.A.A.F. 2019).

In this case, the Defense's theory was that A1C RB fabricated or exaggerated the activity with Appellant because she was angry when she perceived Appellant was making light of and laughing with other Airmen when the topic of sexual assault came up while playing a game a few days later.

The military judge found that no exceptions applied but did not articulate any analysis as to how he reached this conclusion. To be admissible under the constitutionally required exception, it had to be relevant and material. The Defense's theory that A1C RB falsely reported because she felt Appellant made light of sexual assault is not supported by the facts presented at trial. Trial defense counsel attempted to characterize A1C RB's statement that "someone" should be accountable to mean that A1C RB wanted Appellant to be held accountable for the sexual assault she suffered as a child. Neither the testimony of A1C RB nor that of her sister, who also testified regarding A1C RB's conversation with her regarding this assault and how it affected her based on the prior assault, supported this characterization. On appeal, Appellant asserts this statement was probative to A1C RB's motive to fabricate because she was mad at Appellant, conflating her childhood assault with what happened with Appellant, seeking to make Appellant pay for the earlier assault, or some combination of these reasons.

If there was evidence that Appellant had denied any sexual contact had occurred, this characterization might be relevant. But that is not the case. Here, Appellant's admissions demonstrate sexual contact, which his own trial defense counsel described as "a mountain of evidence for abusive sexual contact" but no "credible evidence of penetration." The notion that a prior sexual assault of unknown description would make it more probable that A1C RB fabricated an allegation that Appellant digitally penetrated her is far-fetched and unconvincing based on the record before us. The military judge did not err in finding this evidence was not relevant.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court